IN THE UNITED STATES DISTRIC COURT
WESTERN DIVISION OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| **LISA GREGG** | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **Civil Action No. 12-cv-00978** |
| | § | |
| **TEXAS EDUCATION AGENCY** | § | |
| **Defendant.** | § | |

### PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, LISA GREGG, (hereinafter referred to as "Plaintiff"), by and through her attorney of record, Martin J. Cirkiel from the Law Firm of Cirkiel & Associates, complaining of the TEXAS EDUCATION AGENCY (hereinafter referred to as "Defendant," "TEA" or "Agency") and files this her *Original Complaint and Jury Demand* and would respectfully show as follows:

## I.  NATURE AND PURPOSE OF THE ACTION

Lisa Gregg was a Program Specialist for the Agency for nine years.  Even though she was more educated and had equal if not superior experience as compared to two male colleagues, she was paid less than either.  When she complained about this problem to her supervisor she became a victim of retaliation, was arbitrarily disciplined and was finally dismissed from the Agency as well.  She has filed a complaint with the Equal Employment Opportunity Center who has given her the right to bring suit.  She does so accordingly.

## II. <u>JURISDICTION</u>

1)   Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §§1331 and 1343 because the matters in controversy arise under laws of the United States.

2)   Finally, this Court has jurisdiction to award attorney's fees and costs to the Plaintiff under Title VII of the Civil Rights Act of 1964, (Title VI), Pub. L. 88-352, as amended and  pursuant to 42 U.S.C. §2000e *et.seq.*, and the Equal Pay Act of 1963 29U.S.C. 206 (d)

## III. <u>VENUE</u>

3)   Under 28 U.S.C. §1391, venue is proper before this Court because the events and omissions giving rise to the Plaintiff's claims occurred in the Western District of Texas.

## IV. <u>PARTIES</u>

4)   Lisa Gregg is an individual who lives at 1502 Weyford Drive, Austin, Texas.

5)   The Texas Education Agency is a subdivision of the State of Texas, and is duly authorized under the laws of the State of Texas. They may be served by and through their Commissioner, Michael Williams, 1701 N. Congress, Austin, Texas 78701.

## V. <u>STATEMENT OF FACTS</u>

6)   Ms. Gregg began her career with the Agency on August 11, 1997, as a special education contract monitor and received in-depth specialized training annually for five years.

7)   In February 2002, she became a TEA special education monitor and participated in

the training for a sixth year, now as one of the trainers.

8)  Then in the summer of 2003, the Reduction in Force (RIF) occurred. Her entire division, Accountability, Development and Support, was RIF'ed. Of the nearly fifty special education monitors before the RIF, Ms. Gregg was the only one rehired by TEA.

9)  In January 2006, she made a voluntary, lateral transfer as a Program Specialist IV to the Division of IDEA Coordination as a special education complaint investigator. Later that year, she was reclassified as a Program Specialist V, senior complaint investigator.

10) She remained there in good standing and in early 2009 received a merit increase based on her annual performance evaluation.

11) But for a memo to Deputy Commissioner, Ray Glenn, dated  January 21, 2011 ( in which Gregg's manager, Ms. Gandy, alleged a decline in Gregg's work performance from November 12, 2010, to January 25, 2011) Ms. Gregg regularly progressed in performance, position and responsibility for 13 years. Her unique roadmap (including the RIF) through various divisions at TEA has gave her knowledge about special education that very few possess.

12) As mentioned earlier, she was reclassified to a Program Specialist V in 2006. The reclassification included additional division-related duties. Those duties included representing the complaint team as a member of the State Policy and Continuous Improvement (SPCI) Committee.

13) At the time, Ms. Gregg's responsibilities included, but were not limited to:

    a)     serving as a member of the team reviewing Commissioner Rules;

    b)     serving as the Statewide Lead for the Legal Frameworks project in collaboration with Education Service Center (ESC) 18, a line-by-line comparison of the federal Procedural Safeguards document to the one we developed in Texas;

    c)     rewriting the A Guide to the Admission, Review, and Dismissal Process handbook;

    d)     reviewing residential placement requests; and,

    e)     She also was assigned specific times two weeks a month to field phone calls from whoever called for help (parents, school employees, ESC staff, advocates, students, and attorneys) and resolve those issues.

14) Unfortunate events occurred for her in July and December of 2009. On occasion in both months Ms. Gregg had disagreements with Dr. Swain, the manager for the dispute resolution system, of which she was a part. While she was not Ms. Gregg's manager, she was the manager with whom she worked closely. Both events formed the root of an allegation of a decline in her job performance alleged in Swains later (January 21, 2011) memo.

15) In May 2009, Ms. Gregg and Dr. Swain had a procedural disagreement about an investigation. Soon after, she first began reporting displeasure with some of Ms. Gregg's work habits to her manager, Ms. Gandy.

16) In May 2009, following a panel meeting, Ms. Gregg asked for help in completing

some upcoming IR's that were all due in the same week. This is something that all complaint investigators had done at one time or another for as long as she had been an investigator. At the time, the complaint team had additional folders for a multiple student complaint to look at and coordinate their review with other divisions within TEA. Because it was not an unusual request, investigators jumped in and they started redistributing caseloads.

17) Once they were finished, Dr. Swain became irate saying that those changes had to go through her. Ms. Gregg tried to explain that all investigators do it, it had been commonplace. Other also tried to explain this but Swain was adamant. Ms Gregg stated that it seemed unfair but in the end took back all the IR's. She worked the weekend to finish them so she could have the time she needed to do a thorough review of the folders and be prepared for a June 10, 2009, meeting.

18) The June 10th meeting was ultimately postponed, but all the investigators were prepared and began having meetings to discuss their perspective. Their initial review was in conflict with the report issued by monitoring the year before. The panel viewed the movement as a location change and not a change of placement. Dr Swain either didn't understand or wouldn't understand what panel was saying and she began speaking in defense of the monitoring report. The other investigators acquiesced but Ms. Gregg held strong in her belief because she was making the decision based on regulations and in the best interest of the students, while she felt Dr. Swain's was more political.

19) Following this tense time, Ms. Gregg attempted to extend the olive branch to mend the team. She sent an email to which many on the team replied warmly. Dr. Swain thanked her for including her and asked if they could continue the conversation. Ms. Gregg went to her office on July 17th, 2009, expecting a warm reception. Dr. Swain instead began the conversation in a confrontational way talking about Ms. Gregg's behavior in panel. Gregg apologized again and asked her if there was any way they could make up. Dr. Swain told Ms. Gregg that things between them would never be the same. She said "our truths are different" and they needed to review our philosophies and "read what's on the paper." She left for a meeting before they could finish the conversation.

20) There were common work practices that all the complaint team of investigators, and others on the team continued to use, long after Ms. Gregg was reprimanded for the same. As an example, she was reprimanded by Ms. Gandy because Dr. Swain reported that Ms. Gregg was unprepared for panel meetings. However, Dr. Swain and Ms. Gregg had a conversation that July about her misperception that because she was attending panel with no papers, that she was unprepared for discussion. Ms. Gregg explained to her that with the recent change in the way panel agenda items were sent to them, electronic copies were used now rather than paper copies. Now, she only printed out the pages that she had suggested changes for. Most of the other panel members used this method too. There were many panel meetings that Ms. Gregg attended paperless. An email sent to her by Dr. Swain on July 2, 2009, affirms that

she may have been wrong because she saw evidence that Ms. Gregg in fact provided valuable prepared input.

21) The disagreement in December 2009, was again procedural and involved a particularly outspoken, demanding parent in the Dallas area with whom Dr. Swain had talked on the phone for months. The complaint team conferred the parent's letter did not meet the requirements of 34 CFR §300.153. Even though it was not common practice for the dispute resolution manager to tell an investigator how to resolve a complaint, Dr. Swain intervened on the parent's behalf and demanded that Ms. Gregg investigate the complaint. Here again Gregg was being singled out and reprimanded while other complaint investigators were afforded the use of personal judgment on how to perform the duties as complaint investigators.

22) Ms. Kathy Clayton (Director) required some sort of action to alleviate the disagreements that were building between Dr. Swain and Ms. Gregg. Several options were offered by Ms. Gandy in a meeting and Ms. Gregg chose to have a third party facilitated meeting with Margie Sanford as the facilitator.

23) Ms. Gregg specifically asked Ms. Gandy if this information was going to HR. she assured her that this was a division related event only and no one outside the division would ever see it. Even though Ms. Gregg disagreed with the depiction of recent events, because of this promise she agreed to the facilitated meeting.

24) Dr. Swain, Ms. Sanford and Ms. Gregg met in January 2010 to facilitate discussion and to develop an improvement plan for her. All of them felt the discussion was

mostly beneficial and Ms. Gandy and Ms. Gregg met over the course of the next few months refining and developing her plan. Ms. Gregg continued to ask for help because she didn't understand, but she never got the examples she asked for.

25) About this same time (January 2010), her division began taking cold calls two weeks a month. Of the 30 members in the division, a dozen of them were chosen to be on the phone team. Ms Gregg asked at a division meeting, because four program specialists' names were missing from the phone team roster, how the choice was made about who would be on the phone team. Discussion ensued among numerous staff. At one point a question was asked why the four weren't on the team and Ms. Gandy replied that one reason was they had never been teachers. Ms. Gregg responded that she had not been a teacher either. She snapped her head Gregg's way and in a loud tone said, "I wasn't talking to you!" Ms. Gregg didn't speak again.

26) In June 2010, a public information request (PIR) for records from 2008 was received by her division. Because the request was from one of her regions, Gregg was the investigator responsible for finding the folder. The responsive folder had been misplaced for quite a while; it was in legal services for a time and then the last documented location was Dr. Swain's office. Ms Gregg made a cursory search for the folder with the requested complaint number at her desk but did not see the requested complaint number.

27) Because the space in cubicles is limited, only active folders are kept at their desks. All other folders are gathered randomly throughout the year and taken to the file

room. Those folders then replace the folders that go to the half floor. Once they leave the desks, they really have no control over them. To make it even harder to find the correct folder, the information requested from the citizen and the complaint number given to Gregg did not match. Regardless, Ms. Gregg enlisted three of her fellow investigators, the intake specialist and an administrative assistant, to help her find the folder.

28) First, an investigator and Ms. Gregg looked for the folder in the file room. She took the investigator with her because she cannot view the top drawer of the file cabinet using her bifocals and her knees don't bend enough for her to see the bottom drawer. When the file was not found in the file room, the investigators, intake person, and the administrative assistant went to the half floor. They all looked for quite a while for the folder, but it was not on the half floor. By this time, Ms. Leveque had become the TL. Ms. Leveque and Ms. Gregg went back to her desk, and from there the TL went to Dr. Swain's office to search and Ms. Gregg searched her cubicle again. The folder was in her cubicle with a different complaint number. If she had checked CDRMS immediately upon receiving the PIR, she would have seen that the numbers did not match and she would have known the proper number to look for. Instead, in an effort to demonstrate active responsibility, she enlisted her coworkers to help her with a physical search. The folder was ultimately turned over to the PIR person within the required timeline.

29) Ms. Gandy and Ms. Gregg met to discuss this situation and to update her

improvement plan that was developed during the facilitated meeting in January 2010. They met numerous times and shared multiple emails regarding the issue of being present 100% of the time. It was Ms. Gregg's understanding that she was to address the situation with the public information request (PIR) as part of her improvement plan. Ms. Leveque and Ms. Gregg sat at her desk and developed a goal and objectives that addressed a training issue regarding PIRs. That was not the case and Ms. Gandy and Ms. Gregg again conversed back and forth as to how to write the goal. On July 1, 2010, Ms. Gregg sent Ms. Gandy an email as a follow up to one of their meetings notifying her again that Ms. Gregg did not understand what she was looking for and asked for assistance because she was unsure of the focus.

30)     Ms. Gandy and Ms. Gregg met numerous times in July and finally completed her improvement plan. At one of the meetings, she had asked for examples that Ms. Clayton had shared with Ms. Gandy regarding her performance, but she never responded. Ms. Gregg also requested on July 14th that the complaints manager begin attending their meetings because she was being accused of things that simply were not true. Ms. Gandy said she would consider it, but Ms. Gregg never heard back from her. To date, the only meeting Dr. Swain attended was the Monday meeting prior to her termination. She continued to feel singled out and reprimanded for things that others were not.

31)     Ms. Gregg also was assigned since becoming a Program Specialist V (2006) to review residential application folders. These were requests from LEAs that had

students with disabilities attending non public facilities. Rather than the LEAs incurring the cost for the placement of these students, funds were available to pay for their services, sometimes up to a quarter of a million dollars a year per student. Until this recent change in the review team, an administrative assistant was responsible for ensuring the completion of the applications. What Ms. Gregg found on her initial review was startling; general education teachers rampantly missing from the ARDC meetings of almost all the residential folders she reviewed. Ms. Gregg brought this to Ms. Kaatz' attention who presented the information to Ms. Gandy in an email. Discussion ensued regarding the newness of the process and how they should overlook this. Ms. Gregg again spoke up and reminded her that the residential process had been going on for years (Ms. Gregg monitored them when she was in that division) and a general education teacher was required. Ms. Gregg produced a years old email from Laura Taylor to that effect. Rather than telling them to then begin denying the applications, they were told to approve them, "per Ms. Gandy". Ms. Gregg signed each of her residential folders that way.

32) The aforementioned Dallas ISD parent filed another complaint around this time. Having experience with her now, Ms. Gregg knew that this investigation was going to be time consuming and she needed to be familiar with all the documentation provided. The parent called Dr. Swain incessantly, so much so that Dr. Swain started documenting in CDRMS how long she was on the phone with the parent. The two of them really never stopped communicating from the complaint she filed in November

2009. Documentation Ms. Gregg reviewed showed that Dr. Swain called the principal of the high school to discuss the parent's concerns.

33) The issue with Dr. Swain interfering with Ms. Gregg's investigations began to impede her ability to effectively do her job. Dr. Swain and the complainants would share information that was not at Ms. Gregg's discretion. Dr. Swain would talk to complainants without Gregg's knowledge and without entering those conversations in CDRMS. At one point Dr. Swain sent Ms. Gregg an email and asked what she could do to help her. Ms. Gregg responded by asking her to not talk to complainants because she needed to be the point of contact. Dr. Swain did not do this to the men on the team.

34) It was about this time Ms. Gregg realized that the complaints team needed rules and regulations training. They did not understand the IR regarding homebound services and lengthy discussions and unnecessary guidance requests hampered her response time. Over the course of her work in the complaints unit, other training issues arose. Ms. Gregg and another investigator had several lengthy discussions about the appropriate use of EIS funds for an investigation she was working. Yet another investigator and Ms. Gregg had discussions about surrogate parent assignment. Dr. Swain and Ms. Gregg had disagreements, the last being FAPE. Perhaps legal services should have provided rules and regulations training rather than grammar lessons.

35) In October 2010, Ms. Gregg required the FMLA benefit due to the persistent harassment.

36)     A lot happened in October. Ms. Gregg asked to be removed from the SPCI (State
        Policy and Continuous Improvement) committee. She made the request for a number
        of reasons. Dr. Swain already represented the complaint's team on the SPCI
        committee, and work that would involve an investigator's expertise was being
        parceled out to another complaint team member not on the SPCI committee. Ms.
        Gregg wondered why it took three people to do the work of one required committee
        member. The request was denied without explanation.

37)     Later, Ms. Gregg was sent an email from Ms. Leveque requesting a response as the
        SPCI contact. She instructed Ms. Gregg to provide responses to questions from an
        ESC representative regarding prior written notice (PWN). The questions stemmed
        from a decision made by legal services, Region 18, and Dr. Swain (as the statewide
        lead) regarding changes to the PWN requirements. Although Dr. Swain provided the
        information at a TETN and had worked for months resolving this issue, and the email
        was addressed to Dr. Swain, Ms. Leveque  nevertheless forwarded the email to Ms.
        Gregg.

38)     Ms. Gregg had never answered questions from that mailbox. Her experience with
        providing email responses was to send the information informally and the person who
        actually forwards the information who makes the email public ready. In addition,
        history had taught Ms. Gregg that putting hours into a project on your first attempt is
        not necessary because once all the managers and legal reviews it, you don't even
        recognize when you get it back to incorporate all the suggestions. She knew that once

the managers provided their input, she could make the language more formal.

39) Ms. Leveque also scheduled team meetings in October. During one particular meeting, we were reviewing workflow and Ms. Leveque was redistributing caseloads. She had already redistributed some of Mr. Roberts's IRs they had documentation for when it came to Ms. Gregg's turn. Ms. Gregg told her that she had documentation already for two IRs that were due in November. Ms. Gregg also reminded her that she had one IR started that was due the first part of November and also had about twenty residential folders to review. She told Ms. Gregg that we all had extra things to do and did not re-assign the two IRs that she already had documentation for.

40) During this time Ms. Gregg's mother suffered a serious health condition and her family was concerned that she may have cancer. She did her best to keep Ms. Gandy informed, but she was an emotional wreck.

41) Shortly afterwards, Ms. Gregg's mother took a turn for the worse and she decided she would drive to her house and stay with her for as long as she needed to. Ms. Gregg told the panel of her plans, and as always they pitched in to help. It turned out that she was gone only one day, but in that one day, the panel had reviewed one of her complaints that she had already analyzed. The panel changed her allegations with no explanation or justification in CDRMS. Ms. Gregg went to Ms. Leveque who was the one who signed the acknowledgement letter and asked for an explanation. Her solution was to send out an email entitled Puzzle asking if anyone remembered the reason my allegations were changed. Only one investigator responded and he guessed

at the answer.

42) Ms. Gandy also shared with Ms. Gregg that a panel member had a concern that she doesn't always justify her answers if they are different from the rest of the panel and went to his/her manager to complain. Ms. Gandy said the manager told the person to come to Ms. Gregg first and the person said they had, but yet when Ms. Gregg asked who it was she would not tell her. Ms Gregg didn't understand if the person had already come to her, why the reluctance to divulge who it was. She also told her that a complaint's investigator described her as a bully in panel. Ms. Gregg was shocked because that's exactly how she felt in panel-bullied, ganged up on, and then ignored.

43) At no time was there been a meeting between Ms. Gandy, Dr. Swain, and Ms. Gregg to discuss the various allegations made against her. Instead, Ms. Gandy accepted and acted on the accusations despite the inconsistencies between the accusations of decline in work performance and unprofessional behavior and the emailed expression of regret Dr. Swain sent to Ms. Gregg. In fact, Ms. Gandy and Ms. Gregg met to discuss Dr. Swain's accusation that she did not respond to one of her emails. After expressing confusion about the accusation (Dr. Swain had not discussed the issue with Ms. Gregg first, a division guiding principle), Ms. Gregg found and delivered proof that Dr. Swain's allegation was unsubstantiated, but Ms. Gandy never responded to her request to meet to discuss the false allegation.

44) It is unclear how Ms. Gregg managed to violate so many of the complaint's team Operating Procedures/guidelines when none have ever been approved. The two men

on the team violated the team's OP nearly every time they met. Some examples include, but in no way include all: when the team lost the intake specialist, procedures required another admin. to send out panel notices, however, Mr. Swink took it upon himself to do it and there were occasions when the notices were not similar. Ms. Gregg mentioned it, and was reprimanded by Dr. Swain and accused of not being prepared for panel; Mr. Roberts began sending acknowledgement letters to his regions with a request that the data be sent on disc rather than hard copy. When Ms. Gregg was reassigned one of his cases, she did not want to receive the data on disc. Vigorous discussion in panel ensued and Dr. Swain ultimately sent an email to Ms. Gregg's supervisor that she was uncooperative. Shortly afterwards the complaint team received an email from Dr. Swain that included new language to insert in all acknowledgement letters regarding electronic submission. While Mr. Roberts was in violation of our policy and actually changed the template without approval, Ms. Gregg was the one reprimanded; she repeatedly asked that Mr. Swink follow the policy of presenting his analysis of other investigator's complaints while in panel so everyone had the benefit of his perspective and to be consistent with their procedures. He never complied. Yet every minor infraction of their OP, or no violation at all created unfair treatment and inconsistent enforcement of proposed procedures.

45) Occurring at about the same time as the events above, another chain of events was unfolding.

46) TEA employees received an email from Adam Jones that the Houston Chronicle had

made a public information request regarding agency employees' salaries. Once Ms. Leveque found out that even though she was the investigator with the most time in the division, she was paid the least of the senior investigators, she made it her mission to get equitable pay among investigators. She researched records, Texas Education and Administrative Codes for weeks, and found what she thought was compelling evidence to level all of them. Being the investigator with the most special education experience (more than all the other investigators combined) and a master's degree in special education, Ms. Gregg felt compelled to join her cause since she was not the highest paid among them.

47) Of the four investigators, Mr. Swink holds a principal's master degree, was a classroom debate teacher, and had no previous special education experience prior to his hire at TEA. His salary as a Program Specialist V in December 2010 was over $65,000; Mr. Roberts holds a bachelor's degree in industrial arts with a teaching certificate, was in private industry for most of his career until he fathered a child with disabilities later in life and became an advocate for children with special needs. Mr. Roberts sends an alimony check every month to his ex-wife and visits occasionally but considers himself an expert. His salary as a Program Specialist IV in December 2010 was over $58.000. Ms. Gregg was a house parent and foster parent for children with special needs for 12 years, has more than five years management experience, was a special education monitor for TEA for nine years, and hold a master's degree in special education. Her salary as a Program Specialist V in December 2010 was

$56,777. Ms. Roach, the fourth investigator who has a master's degree and was a teacher in South Korea is a Program Specialist IV and barely made $45,000 in 2010. Ms. Leveque presented the equity question to Dr. Swain with all the investigators present. She said that Ms. Clayton would be the one to talk to regarding pay. The topic was again mentioned, this time in a division meeting. Ms. Clayton and Ms. Leveque began the discussion but Ms Gregg soon joined in. Ms. Clayton essentially told her to shut up, it was none of her business, and that anyone who wanted to discuss the topic could do so with her in private. I didn't speak again. Conversations continued, but the pay disparity was not was neither rectified nor balanced.

48) All the years Ms. Gregg was in the special education monitoring division they answered what they called "cold calls." These were calls from the general public and the parent information line. When she moved to the Division of IDEA Coordinator, complaint investigators were not required to answer cold calls. This changed and our division began sharing the responsibility with monitoring. For two weeks each month our division took cold calls. Of the 30 members in our division, a dozen of us were chosen to be on the phone team. Ms Gregg asked at a division meeting, because four program specialists' names were missing from the phone team roster, how the choice was made about who would be on the phone team. Discussion ensued among numerous staff. At one point a question was asked why the four weren't on the team and Ms. Gandy replied that one reason was they had never been teachers. Ms. Gregg spoke up after she said it and said she had not been a teacher either. She snapped her

head Ms. Gregg's way and in a loud tone said, "I wasn't talking to you!" Ms. Gregg didn't speak again.

49) Being a rule follower, Ms. Gregg faithfully arrived to work on time, took the approved amount of time for lunch, and left when her eight hours were up. By doing this when she transferred to the Division of IDEA Coordination, she saw a lot of my colleagues arrive in the morning and leave in the afternoon. Day after day people would arrive thirty, sixty, even ninety minutes after she did and she would watch those same people leave ahead of her. In a meeting, Ms. Gandy discussed Ms. Gregg leaving early on some days. She couldn't lie to her, it was true, Ms. Leveque and Ms Gregg, on occasion would sneak out fifteen or twenty minutes early. Ms Gregg confessed, but then reminded her that she wasn't the only one that does it. She told her one of the program specialists leaves every day at 2:30 to pick her kids up from school. She knew because she watched her walk by her cubicle as she left the building. There were lots of times she brought the kids back to work with her. She said "no," the person did not and that we were there to talk about Ms. Gregg. On another occasion, Ms. Gregg began not sleeping well. She was up early every day and thought rather than sitting around the house, she could go to work and be productive. This went on for nearly a week when she bumped into Ms. Gandy in the hallway. She asked why Ms. Gregg was there so early and she explained she was test-running the 7:00am shift. It wasn't until one of our Monday meetings that she brought up that kind of change needed to be approved by her. Most everyone in the division came and

went as they pleased. No one kept track of time. Three of the program specialists earlier mentioned as being exempt from the phone team are the most egregious abusers of time. Most days in between 9:00 and 10:00, lunch at 11:30, back at 1:00, and home before 5:00. It was also a rare day to find Dr. Swain in her office on your first attempt.

50) When the results from the Organizational Effectiveness survey were released, the division determined it would set up a committee to address the concerns that could be addressed in the division. The committee designed a survey to be distributed division wide, one filled out by each person for their respective team lead, manager, and division director. While these surveys were anonymous, Ms. Gregg's indicated to Ms. Clayton that our division couldn't move forward until the disparity was balanced.

51) Ms. Gregg is not the first woman to be targeted by Dr. Swain. Bonnie Garza, Danelle Tejada, and Deena Connally were run off by Dr. Swain and Larika Jones and Ms. Gregg were fired at her behest. Dr. Swain treated Ms. Roach so harshly that she went to Lisa Adame in human resources to file a complaint. Rather than resolving the conflict, Ms. Adame went to Dr. Swain and informed her that Ms. Roach had filed a grievance about her. Ms. Roach was pressured to withdraw the grievance. Mr. Swink and Mr. Roberts can do no wrong.

52) There were numerous variables that contributed to Ms. Gregg's dismissal. The impetus was the presentation of the pay disparity between male and female investigators to Dr. Swain who blew them off and directed them to Ms. Clayton. They

addressed it with Ms. Clayton and she essentially told them that they use a competence scale and all of them were where they should be and all discussion would cease about pay standards. Ms. Leveque addressed the issue in private with Ms. Clayton and presented Texas Administrative Code regarding pay adjustments, but nothing was resolved.

53) That started Ms. Gregg's downward spiral, and, Ms. Clayton directed Dr. Swain to begin finding ways to keep her quiet. That was when the retaliation started. Reprimands and awkward confrontations became Ms. Gregg's day-to-day at TEA in an attempt to get her leave on her own. At each meeting she attempted to show how she was being singled out and treated differently than the men on the team and she was simply told that was her perception. Ms. Clayton not only directed Dr. Swain, but also Ms. Gandy to work at ways to reprimand her. Added to Ms. Gregg's improvement plan was an objective requested by Ms. Clayton that she participate 100% since it was her opinion that Ms. Gregg wasn't. At the meeting to add the objective, Ms. Gregg asked for specific examples that Ms. Clayton was referring to. Ms. Gandy could not address any examples, but the objective was still added. At one point both Ms. Gandy and Mr. Swink suggested Ms. Gregg look for alternative work.

54) Following her FMLA leave, Ms. Gregg returned to work on November 12, 2010. The same day, she had a meeting with Ms. Gandy and Ms. Clayton, Division Director. She was presented with a Letter of Reprimand (LoR). One of the requirements was to keep a detailed log of her daily work and provide it to Ms. Gandy at the end of each

week to discuss on the following Mondays. She was on vacation during the holidays and she failed to schedule one of the weekly meetings. Other than that, they met weekly.

55) Additionally, according to OP 07-08, she attempted to resolve the issues in the LoR informally.

56) Ms. Gandy and Ms. Gregg had several meetings, but they were awkward for both of them. Ms. Gandy asked instead that she respond to the LoR via email.

57) Ms. Gregg presented an email response to Ms. Gandy addressing the issues on the 10th day for the informal process. She denied resolution in its entirety. Ms. Gregg chose not to pursue the formal process.

58) The memo from Ms. Gandy recommending Ms. Gregg's involuntary separation was written on Friday, January 21, 2011. It was initialed by Ms. Clayton, Gene Lenz, and Ann Smisko and then sent to Deputy Commissioner Glenn on the same day. According to OP 07-08(g)(2), the memo sent to Deputy Commissioner Glenn should have had three options-approve, deny, or modify. The memo presented to him contained only two options-approve or deny. Ms. Gregg believed if the modify option had been available and more than a business day passed, the outcome could have been different..

59) Following Ms. Gregg's dismissal, on Tuesday, March 22rd a Texas Workforce Commission investigator called her with questions regarding her unemployment insurance benefits application. The investigator told Ms. Gregg that TEA was

disputing her request for unemployment benefits since one of the reasons she was terminated was because of misconduct; an offense that automatically denies everyone unemployment benefits. It was then that she explained to the investigator that she had responded to the letter of termination by hand delivering an appeal letter to the Commissioner's office on Monday, February 7, disputing both reasons for her termination and requesting matriculation. She said the investigation would conclude at the end of the day and that if I were granted benefits, the funds would be transferred to my bank account soon. If the investigator found TEA's allegation of misconduct to be true, my request for unemployment claim would be denied.

60)     The TWC investigation concluded and Ms. Gregg received a letter to that fact. Their findings aligned with her February 7th letter to the Commissioner; she had not exhibited misconduct with regard to the work environment and therefore, her claim had been approved.

61)     As corroborated by an independent state agency investigation, Ms. Gregg did not exhibit misconduct as purported by Ms. Gandy and Dr. Swain Swain and presented in the January 25, 2011, termination letter by Ms. Clayton. The allegation of my diminished work performance is just as hollow.

## VI. <u>CLAIMS UNDER TITLE IX</u>

62) Plaintiff incorporates by reference all the above-related paragraphs with the same force and effect as if herein set forth.

63) Plaintiff contends that these failures of the Defendant to have policies, procedures,

practices and customs in place to assure Plaintiff was not a victim of discrimination based upon gender, or based upon stereotypes based upon gender, violated her rights pursuant to Title VII of the Civil Rights Act of 1964, (Title VI), Pub. L. 88-352, as amended and pursuant to 42 U.S.C. §2000e *et.seq.*U.S.C. § 1681 *et seq.*, upon which she seeks recovery.

64) Specifically she was a victim of discrimination because she was treated differently than her male counterparts.

65) Further, she was a victim of discrimination when she experienced an adverse employment decision, dismissal, in retaliation for advocating for her rights.

66) The acts and omissions of Defendant were willful.

## VII. CLAIMS UNDER THE EQUAL PAY ACT

67) Plaintiff incorporates by reference all the above-related paragraphs with the same force and effect as if herein set forth.

68) Plaintiff contends that these failures of the Defendant to have policies, procedures, practices and customs in place to assure Plaintiff received equal pay as to her male counterparts was a violation of the Equal Pay of 1963, Pub. L. 88-38, as amended and pursuant to 29 U.S.C. §206d *et.seq.,* upon which she seeks recovery.

69) Specifically she was a victim of discrimination because she received a different salary than her male counterparts.

70) Further, she was a victim of discrimination when she experienced an adverse employment decision, dismissal, in retaliation for advocating for her rights.

71) The acts and omissions of Defendant were willful.

## VIII.  PROXIMATE CAUSE

72) Plaintiff incorporates by reference all allegations the above referenced paragraphs with the same force and effect as if herein set forth.

73) Each and every, all and singular of the forgoing acts and omissions, on the part of the Texas Education Agency, taken separately and/or collectively, jointly and severally, constitute a direct and proximate cause of the injuries and damages set forth herein.

## IX. RATIFICATION.

74) The Texas Education Agency ratified the acts, omissions and customs of all personnel and staff.

75) As a result the Defendant is responsible for the acts and omissions of all personnel and staff.

## X.  DAMAGES

76)    Plaintiff incorporates by reference all the above-related paragraphs with the same force and effect as if herein set forth.

77)   Plaintiff has experienced loss of wages, loss of promotion, loss of opportunity, loss of vacation pay, loss of sick leave, loss of retirement, loss of medical benefits and other rights and privileges related to employment, both of a pecuniary and  non-pecuniary type.

## XI.  ATTORNEY FEES

78)    Plaintiff incorporates by reference all the above related paragraphs, as if fully set forth.

79)     It was necessary for the Plaintiff to hire the undersigned attorneys to file this lawsuit.

Upon judgment, Plaintiff is entitled to an award of attorney fees and cost under 42

U.S.C. §2000e et seq.  and 29 U.S.C. 206(d).

## XII.  **DEMAND FOR A JURY TRIAL**

80)     Pursuant to Federal Rule of Civil Procedures 38(b), Plaintiff demands a jury trial for

issues in this matter.

## **PRAYER FOR RELIEF**

81)     WHEREFORE, Plaintiff prays for judgment against Defendant, in the manner

and particulars noted above, and in an amount sufficient to fully compensate her

for the elements of damages enumerated above and as permitted by law,

including but not limited to a judgment to be re-hired, for damages three years

of back pay, for an equal amount due to the willfulness of the Defendant,

reimbursement for all lost sick leave, vacation time, retirement and medical

costs, restore all rights of employment,  recovery of attorney's fees and costs for

the preparation and trial of this cause of action, and for its appeal, if required,

pursuant to 42 U.S.C. § 2000d *et seq.,* together with pre- and post-judgment

interest, and court costs expended herein, and for such other relief as this Court

in equity, deems just and proper.

Respectfully submitted,

Cirkiel & Associates, P.C.

 /s/ Martin J. Cirkiel
Mr. Martin J. Cirkiel, Esq.
1901 E. Palm Valley Boulevard
Round Rock, Texas  78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]
marty@cirkielaw.com [Email]
State Bar No. 00783829
Fed. ID# 21488


ATTORNEYS FOR PETITIONER